GARRETT, J.
*444 *494 Plaintiffs brought this action seeking to enjoin defendant, then the Secretary of State, to certify Initiative Petition 2016-005 (IP 5) for the 2016 general election ballot. The proposed initiative, if passed, purports to be an "application" to Congress to call a constitutional convention pursuant to Article V of the United States Constitution.[1] The secretary refused to certify IP 5 on the ground that it was not a permissible use of the initiative power. Plaintiffs brought claims against the secretary under the state and federal constitutions, and the trial court granted the secretary's motion for judgment on the pleadings.
On appeal, we reject most of plaintiffs' arguments without discussion but write to address what we understand to be the principal issue, which is whether IP 5 proposes a "law" within the meaning of Article IV, section 1(2)(a), of the Oregon Constitution. As explained below, we conclude that it does not, and that the secretary, for that reason, correctly determined that IP 5 is not procedurally compliant with the Oregon Constitution. Accordingly, the trial court did not err in granting the secretary's motion for judgment on the pleadings. We affirm.
The relevant facts are procedural and undisputed. Plaintiffs submitted IP 5, set out in an appendix to this opinion below, to the secretary to commence the process of certifying the petition for the 2016 ballot. The text of IP 5 contains recitals criticizing decisions of the United States Supreme Court regarding campaign finance law and the political rights of corporations. Following those recitals, Section 1 of the petition states, "We the People of the state of Oregon * * * hereby call for an Article V Convention *495 by enacting into law this Application, in accordance with Article V of the U.S. Constitution, for the specific and exclusive purpose of considering a Constitutional Amendment consistent with" two enumerated principles, which IP 5 denominates, respectively, "Corporations Are Not People" and "Money is Not Speech." Section 2 provides that the initiative shall be a "continuing application * * * until at least two-thirds of the legislatures of the several states have made similar applications pursuant to Article V." Section 3 provides that copies of IP 5 "shall be transmitted" by unspecified persons "to the President of the United States" and other officials. Section 4 provides that IP 5 shall be codified in the Oregon Revised Statutes.
While certification was pending, the Attorney General issued a letter opinion advising the secretary that "a court reviewing the initiative would probably conclude that the application for a constitutional convention is not a 'law' for purposes of exercising the initiative power reserved to the people of Oregon." See generally Or. Const., Art. IV, § 1 (2)(a) ("The people reserve to themselves the initiative power, which is to propose laws and amendments to the Constitution * * * at an election independent of the Legislative Assembly." (Emphasis added.) ). Citing that letter, the secretary refused to certify IP 5 pursuant to OAR 165-014-0028(1) (secretary reviews an initiative petition "to determine if it complies with the procedural requirements established in the Oregon Constitution").
Plaintiffs filed this action to enjoin the secretary to certify the petition, and the secretary moved for judgment on the pleadings. The trial court granted the secretary's motion, affirming the secretary's and Attorney General's conclusion that IP 5 failed to propose *445 a "law" under the Oregon Constitution. Plaintiffs appeal.
While this appeal was pending, the deadline for submitting enough signatures to place IP 5 on the ballot for the 2016 general election passed (as did the election itself), rendering the case moot. See Couey v. Brown , 257 Or.App. 434, 443, 306 P.3d 778 (2013), rev'd on other grounds sub nom. , Couey v. Atkins , 357 Or. 460, 522-23, 355 P.3d 866 (2015) (challenge to proposed initiative moot after deadline *496 for collecting signatures and the election had passed). The parties have not addressed whether the case remains justiciable. We address that issue first.
Under ORS 14.175, an otherwise moot case that involves a constitutional challenge to the act of a public body is justiciable if (1) the party that commenced the action had standing to commence it, (2) the challenged act (here, the secretary's rejection of IP 5) is capable of repetition, and (3) the challenged act is likely to evade judicial review in the future. See Couey , 357 Or. at 520, 355 P.3d 866 (Oregon Constitution does not impose "justiciability limitations on the exercise of judicial power in public actions or cases involving matters of public interest"). All three requirements under the statute are met here. First, plaintiffs have standing to challenge the secretary's decision. See ORS 246.910 (appeals for acts and orders by secretary). Second, the issue in this case is capable of repetition because plaintiffs could resubmit the same or a similar initiative petition in a future election and the secretary could reject it for the same reason as here. Third, future challenges to this (and similar) initiative petitions are likely to evade judicial review because election cycles are short and the judicial process can be lengthy. See Couey , 357 Or. at 477-83, 355 P.3d 866 (applying the "capable of repetition, yet evading review" exception to an election-related challenge); see also State ex rel. Smith v. Hitt , 291 Or.App. 750, 754, 424 P.3d 749 (2018) (same).
However, even where all elements of ORS 14.175 are met, it is a matter of our discretion whether to review a moot issue. Eastern Oregon Mining Association v. DEQ , 360 Or. 10, 19, 376 P.3d 288 (2016) ; Eastern Oregon Mining Assoc. v. DEQ , 285 Or.App. 821, 829, 398 P.3d 449, rev. allowed , 362 Or. 175, 406 P.3d 612 (2017). In deciding whether to exercise our discretion, we consider several "prudential justifications," including, but not limited to, (1) the adversarial nature of the parties' interests, (2) whether the parties are advocating narrow arguments and rules of law that may benefit only themselves or are presenting arguments affecting a wider group of parties or interests, (3) judicial economy, and (4) the extent of the public importance of the issues presented. Eastern Oregon Mining , 285 Or.App. at 830, 398 P.3d 449.
*497 Here, the second and fourth factors strongly favor review. Whether a proposed ballot initiative meets the procedural requirement of being a "law" under Article IV, section 1, is an issue relevant to future initiative petitions and one that Oregon courts have not yet addressed; therefore, the issue being litigated would affect a wider class of interests than the parties to this case. See Eastern Oregon Mining , 285 Or.App. at 833, 398 P.3d 449 (second factor favored exercising discretion because, while the "litigated issues certainly affect the parties," they would also affect "a wider class of interests-those interested in the proper regulation and practice of small suction dredge mining, including government, environmental, and mining interests"). The fourth factor, the "relative public importance of the issues," id. at 832, 398 P.3d 449, also favors review, given that the proposed measure purports to express the views of Oregonians on whether to call a national constitutional convention. Cf. Smith , 291 Or.App. at 754, 424 P.3d 749 ("Because this case concerns an initiative measure enacted by the voters of Douglas County that imposes term limits on a public office, and therefore concerns a matter of public importance, we exercise our discretion to review the case."). The other prudential considerations do not weigh against review.
Accordingly, we conclude that, although the case is moot, it is justiciable under *446 ORS 14.175, and we exercise our discretion to review it. We turn to the merits.
As noted, plaintiffs attack the secretary's and the trial court's reasoning on various grounds. As far as we can tell, however, plaintiffs agree that, to constitute a valid exercise of the initiative power, IP 5 must propose a "law" under Article IV, section 1(2)(a), and if it does not, then the secretary was not required to certify it for the ballot. Cf. Herbring v. Brown , 92 Or. 176, 182, 180 P. 328 (1919) (upholding Attorney General's refusal to provide a ballot title for a referendum that proposed neither a "bill" nor an "act" as provided in Article IV, section 1 of the Oregon Constitution ). We address that question below.
Article IV, section 1, of the Oregon Constitution provides, in relevant part:
*498 "(1) The legislative power of the state, except for the initiative and referendum powers reserved to the people, is vested in a Legislative Assembly, consisting of a Senate and a House of Representatives.
"(2)(a) The people reserve to themselves the initiative power, which is to propose laws and amendments to the Constitution and enact or reject them at an election independently of the Legislative Assembly."
(Emphasis added.)
Because, following a legislative referral, the relevant language in Article IV, section 1, was adopted by the voters as an amendment to the Constitution in 1902, our task in construing the provision requires us to discern the voters' intent by applying the analytical framework set out in Ecumenical Ministries v. Oregon State Lottery Comm. , 318 Or. 551, 559-60, 871 P.2d 106 (1994). See Stranahan v. Fred Meyer Inc., 331 Or. 38, 57-58, 11 P.3d 228 (2000) (holding that, in construing constitutional amendment referred to voters by the Legislative Assembly, Oregon courts use methodology set out in Ecumenical Ministries for construction of constitutional provisions adopted through initiative process); see also State v. Lane , 357 Or. 619, 625, 355 P.3d 914 (2015) (explaining aim of constitutional interpretation method). We first examine the text of the provision in context; if the voters' intent remains unclear, we also examine the enactment history of the provision and consider applicable canons of constitutional construction. Ecumenical Ministries , 318 Or. at 559-60, 871 P.2d 106. Although constitutional provisions that empower the people to propose and vote on initiatives and referenda are to be liberally construed to achieve their purpose, Barnes v. Paulus , 36 Or.App. 327, 333, 588 P.2d 1120, rev. den. , 284 Or. 81, 588 P.2d 1084 (1978), it is also true that the "authority of the electorate to enact measures by popular vote is not * * * without limitation," Amalgamated Transit v. Yerkovich , 24 Or.App. 221, 225, 545 P.2d 1401 (1976).
Beginning with the text of Article IV, section 1, we presume that the voters intended the provision's language to be given its ordinary meaning. Ecumenical Ministries , 318 Or. at 560, 871 P.2d 106. The relevant language in that provision, "propose *499 laws ," was first adopted in 1902.[2] In 1902, "law" ordinarily meant:
*447 "1. In general, a rule of being or of conduct, established by an authority able to enforce its will; a controlling regulation; the mode or order according to which an agent or a power acts.
"* * * * *
"4. In human government: (a ) An organic rule, as a constitution or charter, establishing and defining the conditions of the existence of a state or other organized community. (b ) Any edict, decree, order, ordinance, statute, resolution, judicial decision, usage, etc., made, or recognized, and enforced, by the controlling authority."
Webster's International Dictionary 835 (unabridged ed. 1898) (boldface and italics in original). The term was also defined in contemporaneous legal dictionaries:
"1. That which is laid down, ordained, or established. A rule or method according to which phenomena or actions co-exist or follow each other.
"2. A system of principles and rules of human conduct, being the aggregate of those commandments and principles which are either prescribed or recognized by the governing power in an organized jural society as its will in relation to the conduct of the members of such society, and which *500 it undertakes to maintain and sanction and to use as the criteria of the actions of such members."
Black's Law Dictionary 690 (1st ed. 1891) (boldface omitted; emphasis in original). Alexander M. Burrill's A New Law Dictionary and Glossary states:
"In the most general sense,-a rule of action prescribed by a superior. * * *
"In a stricter sense,-a rule of civil conduct, prescribed by the supreme power in a state. * * * Blackstone's definition, in full, is, 'a rule of civil conduct, prescribed by the supreme power in a state, commanding what is right and prohibiting what is wrong.' * * *
"In the strictest sense,-a statute; a rule prescribed by the legislative power. 'The laws of a state,' observes Mr. Justice Story, 'are more usually understood to mean the rules and enactments promulgated by the legislative authority thereof, or long established local customs having the force of laws.' "
Alexander M. Burrill, 2 A New Law Dictionary 664 (1850) (emphasis in original); cf. State v. Werdell , 202 Or.App. 413, 425, 122 P.3d 86 (2005) (citing Burrill's law dictionary).[3]
All of those definitions share (at least) two similarities. First, they all define a "law" as a "rule" of civil conduct or action. Second, they explain that the "rule" applies to members of a particular community over which the rulemaking entity has authority. One does not make "laws" for people over whom one exercises no controlling authority.
Oregon cases interpreting Article IV, section 1, provide additional context for the phrase "to propose laws." See Kerr v. Bradbury , 193 Or.App. 304, 315, 89 P.3d 1227 (2004) (contextual analysis includes examination of case law construing relevant constitutional provisions). Although no cases, to our knowledge, discuss the meaning of that phrase *501 specifically, several cases dealing with preelection and post-enactment challenges to initiatives and referenda have consistently limited the scope of the initiative and referendum powers to encompassing the proposal of measures that set forth "rules of civil conduct" that are "permanent" and of "general application," rejecting measures that propose something else-that is, something that is administrative, executive, adjudicative, or advisory in nature. See, e.g. , Amalgamated Transit , 24 Or.App. at 226-27, 545 P.2d 1401 (initiative measures must propose "rules of civil conduct * * * of general application" relating to "questions or subjects of a permanent or general character," and not something "executing a law already in existence" (internal quotation marks and italics omitted; ellipsis in *448 Amalgamated Transit ) ); Rossolo v. Multnomah County Elections Div. , 272 Or.App. 572, 584, 357 P.3d 505 (2015) ("In classifying an enacted or proposed law as * * * subject to the initiative and referendum provisions in the Oregon Constitution[,] * * * Oregon courts assess the law to determine if it makes policy of general applicability and is more than temporary in duration * * *, or if it applies previous policy to particular actions, or is otherwise compelled in substance or process by predicate policy * * *."); Beal v. City of Gresham , 166 Or.App. 528, 537, 998 P.2d 237 (2000) (part of proposed initiative that "establish[ed] the procedure by which * * * decisions will be made" was appropriate use of initiative power); Long v. City of Portland , 53 Or. 92, 100-01, 98 P. 149 (1908), reh'g den. , 53 Or. 92, 98 P. 1111 (1909) ("[Acts subject to referendum] must be considered in the sense of general laws, namely, rules of civil conduct prescribed by the lawmaking power and of general application. * * * [T]he law is said to be a rule-not a transient, sudden order to and concerning a particular person, but something permanent, uniform, and universal."). In contrast, a measure which is merely a "public opinion bill, advisory in nature," and thus "which sets forth no prescribed rule of civil conduct," is not considered to be an appropriate use of the initiative and referendum powers. Amalgamated Transit , 24 Or.App. at 225, 228, 545 P.2d 1401 ("The courts have * * * taken cognizance of the ways in which the conduct of government would be seriously hampered were the initiative and referendum to be used to compel or bar 'administrative' acts by elected officials."). *502 In short, the foregoing authorities suggest that the phrase "to propose laws" in Article IV, section 1(2)(a), should be interpreted to refer to the proposal of measures that establish new legal rules regulating conduct in the state of Oregon, typically of a permanent and generally applicable nature.[4]
With that understanding, we return to the text of IP 5 and conclude that, whatever it does, it does not propose a "law." Importantly, IP 5 does not purport to affect the conduct of anyone within the State of Oregon. Plaintiffs concede that "[t]he largest effect of IP 5 is upon Congress" and "IP 5 says nothing about what Oregon elected officials should or should not do." Although the measure says that copies of IP 5 will be "transmitted" to various federal officials, the petition binds no particular state entity to do so. Thus, it cannot be said that IP 5 proposes a rule that is made and enforced by "the controlling authority" of those being governed by the rule. Put simply, IP 5 would regulate no one in Oregon and, thus, would not be an exercise of Oregon lawmaking.[5]
*449 *503 IP 5 also bears little resemblance to a "rule of conduct." The core purpose of IP 5 is to "call" or "apply," and thus trigger (supposing enough other states implement similar applications), a constitutional convention under a pre-existing process set out in Article V of the United States Constitution. If passed (and if enough other states passed similar measures), IP 5 would ostensibly require Congress to hold a convention and consider certain enumerated legal principles at that convention; however, once such a convention were to convene, the measure would cease to have any effect. See, e.g. , Rossolo , 272 Or.App. at 584, 357 P.3d 505 (measure may be proposed via initiative petition if it "makes policy of general applicability," but not if it "applies previous policy to particular actions, or is otherwise compelled in substance or process by predicate policy"); Beal , 166 Or.App. at 537, 998 P.2d 237 (measure may be proposed via initiative petition if it establishes the procedure by which decisions will be made); State ex rel. Dahlen v. Ervin , 158 Or.App. 253, 257, 974 P.2d 264, rev. den. , 329 Or. 357, 994 P.2d 124 (1999) (proposed initiative that "does not attempt to change a specific siting decision of the county but, rather, to change the framework within which the county makes siting decisions" was an appropriate use of the initiative power).
*504 Rather, what IP 5 undisputedly does is express the will of Oregon voters for Congress to hold a constitutional convention. In that way, IP 5 is more akin to a legislative memorial. See Office of Legislative Counsel, Bill Drafting Manual § 16.5 (2018) (A joint memorial is used when both houses of the Legislative Assembly join to address or petition Congress, the President of the United States or the officials or agencies of another governmental body."); id. at § 16.1 ("A resolution or memorial is not a law and is not submitted to the Governor for approval or disapproval."); Oregon Legislative Assembly, Form and Style Manual for Legislative Measures, 19, 57 (2017) (same). Indeed, the Oregon legislature has already passed a joint memorial very similar to IP 5. See, e.g. , House Joint Memorial 6 (2013) (criticizing the Supreme Court's decision in Citizens United v. Federal Election Comm'n , 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), and resolving that the Oregon legislature "urge[s] the Congress of the United States of America to propose and send to the states for ratification an amendment to the United States Constitution * * * clarifying the distinction between the rights of natural persons and the rights of corporations and other legal entities" and that "a copy of this memorial shall be sent to the President of the United States" and other federal officials). There is little question that a legislative memorial would fall outside the scope of the initiative and referendum powers. See Amalgamated Transit , 24 Or.App. at 228, 545 P.2d 1401 (measure that is a "public opinion bill, advisory in nature" is not an appropriate use of the initiative and referendum powers); cf. Herbring , 92 Or. at 182, 180 P. 328 (Attorney General was not required to approve for the ballot a referendum to pass a legislative resolution voting to ratify a proposed amendment to the United States Constitution because legislative resolutions fall outside the scope of the referendum power).
*450 Courts of other states have reached similar conclusions regarding initiatives and referenda that propose applications for constitutional conventions and other functions under Article V. The Supreme Judicial Court of Massachusetts concluded that an initiative requesting the legislative assembly to support an amendment to the Massachusetts Constitution to repeal an amendment of the *505 United States Constitution was not a "proposed law" under the Massachusetts Constitution:
"The word 'law' imports a general rule of conduct with appropriate means for its enforcement declared by some authority possessing sovereign power over the subject; it implies command and not entreaty; it is something different in kind from an ineffectual expression of opinion possessing no sanction to compel observance of the views announced. The text of the proposed law accompanying this initiative petition does not prescribe a general rule of conduct. It merely invites a declaration of opinion by voters on a subject over which the people of the commonwealth possess no part of the sovereign power."
Opinion of the Justices Relative to the Eighteenth Amendment of the Constitution of the United States , 262 Mass. 603, 605, 160 N.E. 439, 440 (1928).
Similarly, the Supreme Court of California concluded that a proposed initiative requiring the California legislature to adopt a resolution applying to Congress for an Article V convention was not a "statute" under the California Constitution. See American Federation of Labor v. Eu , 36 Cal. 3d 687, 206 Cal.Rptr. 89, 686 P.2d 609 (1984). That court reasoned that the initiative proposed "in part a simple declaration of policy, without statutory implementation, and in part a step in a federal process which may eventually lead to amendment of the federal Constitution." Id. at 714, 206 Cal.Rptr. 89, 686 P.2d at 627. The initiative accordingly did "not create law and thus * * * [did] not 'adopt' a 'statute' within the meaning of article II of the California Constitution." Id. at 714, 206 Cal.Rptr. 89, 686 P.2d at 628 ; see also, e.g. , In re Initiative Petition No. 364 , 1996 O.K. 129, 930 P.2d 186, 195 (1996) (application for an Article V convention "is not binding, * * * is incapable of being carried into effect, and * * * is incapable of being enforced").
In sum, the text and context of Article IV, section 1, reflect that the voters did not intend for the scope of the initiative power to include applications for Article V conventions to amend the United States Constitution. We conclude that IP 5 does not propose a "law" and consequently fails to meet the procedural requirements for initiative petitions under Article IV, section 1, of the Oregon Constitution.
*506 Accordingly, the trial court did not err in granting the secretary's motion for judgment on the pleadings.
Affirmed.
*507 APPENDIX
INITIATIVE PETITION 2016-005
Oregon We the People Initiative
Whereas:
• Decisions by the U.S. Supreme Court have equated spending money in elections with speech and granted corporations the constitutional rights of the People, permitting the wealthy to buy enormous influence in our government through uncontrolled political spending. This undermines the aspirations of Oregonians to a true democracy with a level playing field.
• Corporations, including for-profit and non-profit organizations, unions, and other artificial legal entities, are created under state laws. There is no mention of these entities in the Constitution.
• Money is property, not speech. Its unregulated use for political purposes creates unequal access to political power and influence. Money contributed or spent for political purposes should he subject to regulation.
Therefore:
(1) We the People of the state of Oregon, with the legislative power retained by us under the Oregon Constitution (including Article IV, Section 1, and Article II, Section 18 ), hereby call for an Article V Convention by *451 enacting into law this Application, in accordance with Article V of the U.S. Constitution, for the specific and exclusive purpose of considering a Constitutional Amendment consistent with the following principles:
(a) Corporations Are Not People. Artificial entities, such as corporations, unions and non-profit corporations, established by the laws of any State, the United States, or any foreign state, shall have no constitutional rights and shall be subject to regulation by the People, through Federal, State or Local law. Nothing in this clause shall be construed to *508 limit the rights of the People as specified in the U.S. Constitution and its Amendments.
(b) Money is Not Speech. Money is property and shall not be construed as speech. The People, to ensure a level playing field for all people regardless of their economic status, empower and direct Federal, State, and Local governments to regulate, limit or prohibit the contribution and spending of money for political purposes and to require full and prompt public disclosure of all such transactions.
(2) This measure constitutes a continuing application in accordance with Article V of the Constitution of the United States, until at least two-thirds of the legislatures of the several states have made similar applications pursuant to Article V.
(3) A copy of this initiative shall be transmitted to the President of the United States; to each member of the Oregon Congressional Delegation; to the presiding officers of the U.S. Senate and House of Representatives; to each Governor and presiding office of each legislative body of each of the United States.
(4) This Application shall be codified in Title 17 of Oregon Revised Statutes.

Article V of the United States Constitution provides, in relevant part:
"The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments , which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress [.]."
(Emphasis added.)

When the initiative and referendum power was first adopted in 1902, Article IV, section 1, provided, in relevant part:
"The legislative authority of the state shall be vested in a Legislative Assembly, consisting of a Senate and House of Representatives, but the people reserve to themselves power to propose laws and amendments to the Constitution * * * independent of the Legislative Assembly * * *. The first power reserved by the people is the initiative[.] "
(Emphasis added.) The provision was later amended in 1968, although that amendment did not change the phrase "propose laws." According to the 1968 official Voters' Pamphlet, the 1968 amendment was intended primarily to (1) change the basis for determining the number of signatures required for initiative and referendum petitions, (2) allow additional time after the filing deadline for certification of signatures, and (3) "clean up" the wording and obsolete sections while "in no way * * * diminish[ing] the power of the people to initiate or refer measures." Official Voters' Pamphlet, Primary Election, May 28, 1968, 8; State v. Campbell/Campf/Collins , 265 Or. 82, 89, 506 P.2d 163 (1973). We accordingly assume that the 1968 amendment made no substantive changes to the scope of the initiative powers. See id. at 90, 506 P.2d 163. Plaintiffs agree that, for purposes of our review, the meaning of the term "laws" has not changed since 1902.

The ordinary meaning of "law" had changed little when Article IV, section 1, was amended in 1968 Webster's provided:
"The binding custom or practice of a community; rules or mode of conduct made obligatory by some sanction which is imposed and enforced for their violation by a controlling authority."
Webster's New Int'l Dictionary 1401 (unabridged 2d ed. 1961).

The parties have identified nothing in the enactment history of Article IV, section 1, that suggests that the voters who enacted the provision had a different understanding of the ordinary meaning of "laws" or the scope of the initiative power. See Ecumenical Ministries , 318 Or. at 560 n. 8, 871 P.2d 106 (enactment history of a constitutional amendment adopted by initiative includes sources of information available to the voters at the time the measure was adopted and that disclose the public's understanding of the measure, such as news reports published before the relevant election). Newspaper articles published in the months preceding the passage of the 1902 amendment indicate that voters would have understood the initiative and referendum powers as concerning lawful rules that affect Oregonians. See Let The People Decide: Purpose of Initiative and Referendum Amendment. Judge Williams Replies to a Recent Critic of the Popular Legislative Plan. , The Morning Oregonian 10 (May 27, 1902) ("The initiative and referendum is simply a practical application of the principle of self-government by the people, and it has been found by actual experience that people can be trusted to vote directly upon any legislative enactments affecting their interests."); Vote for the Amendment: Plea for Initiative and Referendum Amendment by League Voters , The Morning Oregonian 10 (May 31, 1902) (statement of G. Y. Harry, organizer of the State Federation of Labor) ("[T]he power of the people to initiate their own laws[ ] should appeal to all classes of our citizens alike."); accord The Initiative and Referendum. , Coquille City Herald (May 20, 1902); see also, e.g. , The Referendum , The East Oregonian (April 2, 1902) (publishing various endorsements of the amendment, including an endorsement by a Hillsboro publication) ("[J]ust vote yourself the rights to have something to say about laws under which you must live.").

Regardless of the effect that IP 5 would have on Oregonians, there are strong reasons to believe that IP 5 would be ineffective as part of a multistate effort to bind Congress, which, if true, would be yet another reason why IP 5 fails to propose a "law." In Hawke v. Smith , 253 U.S. 221, 227, 40 S.Ct. 495, 64 L.Ed. 871 (1920), the United States Supreme Court held that the term "Legislatures," in its second iteration in Article V regarding the ratification of proposed amendments, refers to only legislative bodies of states rather than citizens acting through the initiative and referendum power. Under the reasoning set out in Hawke , the term "Legislatures" in its first iteration under Article V also likely refers only to state legislatures. Cf. Morrissey v. State , 951 P.2d 911, 916 (Colo 1998) ("The citizens' use of the initiative process to demand passage of a constitutional amendment clearly violates the strict language of Article V, which precludes state citizens from direct participation in the amendment process."); American Federation of Labor v. Eu , 36 Cal. 3d 687, 706, 686 P.2d 609, 622, 206 Cal.Rptr. 89 (1984) ("We conclude that a state may not, by initiative or otherwise, compel its legislators to apply for a constitutional convention, or to refrain from such action. Under [A]rticle V, the legislators must be free to vote their own considered judgment, being responsible to their constituents through the electoral process.").
Plaintiffs disagree and argue that the Court would conclude that a state may apply for a constitutional convention via the initiative power. That argument presumes either that the Court would overrule Hawke or that the term "Legislatures" has two different meanings within the same clause of Article V. In any event, we need not further consider that issue, because, for the other reasons explained in this opinion, we conclude that IP 5 fails to propose a "law" for purposes of Article IV, section 1, of the Oregon Constitution.